IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION


CARLOS EUGENE OAKES                                                          PLAINTIFF


v.                                    NO. 3:17-cv-00289 PSH


NANCY A. BERRYHILL, Acting Commissioner                             DEFENDANT
of the Social Security Administration


MEMORANDUM OPINION AND ORDER


Plaintiff Carlos Eugene Oakes ("Oakes") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, he challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

Oakes maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers two reasons why.[1] Oakes first maintains that his epilepsy meets or equals a listed impairment, and the ALJ erred in failing to so find at step three of the sequential evaluation process. Oakes also maintains that his residual functional capacity was erroneously assessed. It is Oakes' contention that the ALJ failed to give good reasons for rejecting the opinions of Oakes' treating physician, a physician who opined that Oakes can lift and carry no more than twenty pounds.

---

[1]      The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

The record reflects that Oakes was born on March 7, 1957. He filed an application for disability insurance benefits on June 2, 2015, in which he alleged that he became disabled beginning on May 26, 2015, as a result of, inter alia, a seizure disorder.

Oakes ably summarized the evidence in the record, and the Commissioner did not challenge the summary. It will not be reproduced, except to note several matters germane to the issues raised in the parties' briefs.

The record reflects that on May 28, 2014, Oakes saw a neurologist, Dr. Demetrius Spanos, M.D., ("Spanos") complaining of a convulsion that had occurred one month earlier. See Transcript at 280-281. A physical examination revealed, inter alia, that Oakes had 5/5 strength bilaterally and normal muscle tone and bulk. Spanos did not believe the "episode" to be "related to a seizure disorder but rather perhaps heat prostration …" See Transcript at 281. Spanos continued Oakes on Dilantin and noted that follow-up would continue "on an annual basis as before." See Transcript at 281.

On June 2, 2014, Oakes saw Dr. Donald Guinn, M.D., ("Guinn") complaining of cognitive difficulties, a cough, and nasal symptoms. See Transcript at 310-313. The progress note reflects that Oakes also reported having a "spell" at work, one in which "everything slow[ed] down, he [was] able to function but at a slow [pace], [and] state[d] it [was] not like a seizure." See Transcript at 310. A physical examination revealed, inter alia, that he had normal movement in his extremities and normal muscle tone and bulk. Guinn's diagnoses included convulsions.

On December 1, 2014, Oakes saw Guinn for complaints of anxiety and wrist pain. See Transcript at 271, 306-309. The progress note from the examination is relevant because Guinn noted that Oakes had not experienced any new seizures in several years.

On May 7, 2015, Oakes saw Spanos for an annual check-up. See Transcript at 282-283. The progress note from the examination reflects normal findings. For instance, a physical examination revealed that Oakes had 5/5 strength bilaterally and normal muscle tone and bulk. Spanos continued to diagnose convulsions and prescribe Dilantin.

On June 1, 2015, Oakes saw Guinn complaining of heartburn, palpitations, and rectal pain. See Transcript at 301-305. The progress note reflects that Oakes reported having another "spell" at work, one in which he felt "absent and in a daze." See Transcript at 301. Oakes did not believe it was a seizure. A physical examination revealed, inter alia, that he had normal movement in his extremities and normal muscle tone and bulk. Guinn opined that it was physiologically "ok" for Oakes to work and/or be employed but noted he might be limited in his choice of a job.

On July 9, 2015, Spanos completed a Treating Physician's Report for Seizure Disorder for the state agency. See Transcript at 332-333. Spanos described Oakes' seizures as "convulsive" but represented that Oakes had not had a seizure in the year prior to July 9, 2015. Spanos reported that Oakes was taking 200 mg of Dilantin and had been doing so for greater than three years. Spanos reported that an EEG had been performed on April 28, 2014, and the results were normal.

On February 8, 2016, Oakes saw Guinn and complained of frequent seizures. See Transcript at 336-339. The progress note reflects the following as to the seizures: "[Oakes] is applying for disability due to 'absent spells" … not his grandmal but unawareness …" See Transcript at 336. A physical examination was unremarkable. Guinn's diagnoses included convulsions. Guinn recommended that Oakes wait six months before seeking follow-up.

On June 28, 2016, Oakes saw Spanos complaining of seizures. <u>See</u> Transcript at 355-356. The progress note reflects the following with respect to Oakes' medical condition:

> [Oakes] remains on Dilantin 200 mg BID. He states that his most recent Dilantin level drawn about six month's ago at Dr. Guinn's office was in the 13-15 range. [Oakes'] wife indicates he has had several episodes of blank staring which [he] now admits occurs frequently. Many of these episodes are related to stress. He denies any other symptoms of headaches, diplopia, vision loss, dysarthria, aphasia, dysphagia, focal weakness, numbness, or incoordination.

<u>See</u> Transcript at 355. A physical examination revealed, <u>inter alia</u>, that Oakes had 5/5 strength bilaterally and normal muscle tone and bulk. Spanos continued to diagnose convulsions and made the following observations:

> [Oakes] will have a Dilantin level check[] and I have recommended for now that we try adding Depakote to his regimen. I gave him a very low dose of Depakote 250 mg per day to see if this will help with his anxiety rather than assist with his seizure disorder. We can consider increasing the Depakote to 500 mg per day. I will follow-up with him in a month in part because he has significant concerns, as does his wife, with Depakote use. … If his symptoms persist, I will consider repeating an EEG and comparing it to the previous study of 2 ½ years ago which was normal.

<u>See</u> Transcript at 356.

On July 27, 2016, an EEG was performed. <u>See</u> Transcript at 353-354. The results of the EEG were normal and revealed, <u>inter alia</u>, "no evidence of epileptiform activity to indicate seizure disorder." <u>See</u> Transcript at 354.

Oakes saw Spanos again on August 10, 2016, for what Spanos characterized as partial epilepsy. <u>See</u> Transcript at 351-352. The progress note reflects the following with respect to Oakes' medical condition:

> [Oakes] is currently taking Dilantin 200 mg BID. He has not had any significant increase to his seizure activity. He has found that Depakote use diminishes the feelings that seem to precede seizure, however, he was unable to tolerate more than 250 mg per day due to somnolence. He denies any other symptoms of headache, diplopia, vision loss, dysarthria, aphasia, dysphagia, focal weakness, numbness, or incoordination.

See Transcript at 351. A physical examination revealed, inter alia, that Oakes had 5/5 strength bilaterally and normal muscle tone and bulk. Spanos diagnosed partial epilepsy and continued Oakes on Dilantin and Depakote. Spanos noted that provided no new problems arose, he would see Oakes again in one year.

On August 19, 2016, Guinn completed a Medical Source Statement-Physical ("Statement") on behalf of Oakes. See Transcript at 332-333. In the Statement, Guinn represented that Oakes has a "seizure disorder (absent petit mal convulsions) that happen[s] daily to weekly" and prevents him from driving or operating machinery. See Transcript at 358. Guinn opined, inter alia, that Oakes is limited to lifting and carrying a maximum of twenty pounds on an occasional and frequent basis. Guinn represented that his opinions were supported by his "consultation with neurologist Dr. Spanos." See Transcript at 359.

Oakes and members of his family completed a series of documents in connection with Oakes' application for disability insurance benefits. With respect to his seizures, Oakes reported in a July 7, 2015, document that they cause him to "black out and stare out," lose a sense of time, and occasionally bite his tongue. See Transcript at 200. Afterwards, the seizures leave him weak and make it difficult to walk. He reported experiencing two to three seizures a week and more than a hundred seizures in the year prior to July 7, 2015.

Oakes' wife reported in a July 7, 2015, document that she has seen Oakes experience numerous seizures and convulsions. See Transcript at 202-203. During the episodes, he will swallow, drop what he is holding, and, if standing, teeter. He appears to be unable to see or hear anyone. She estimated that she had seen about eight of the seizures in the year prior to July 7, 2015.

Oakes' brother and sister-in-law reported in July 7, 2015, documents that they have seen Oakes experience seizures and convulsions. See Transcript at 204-205, 206-207. Oakes' brother and sister-in-law reported that during the seizures, Oakes stands still, does not blink, and is unable to talk or respond to questions. Oakes' brother was unable to estimate how many seizures he had seen, but Oakes' sister-in-law estimated that she had seen two seizures in the year prior to July 7, 2015.

The record contains evidence of Oakes' work record. See Transcript at 151-163. His work record is quite good as he had significant earnings for the years between 1994 and 2014.

Oakes testified during the administrative hearing. See Transcript at 37-48. He previously experienced grand mal seizures, but medication has helped reduce their frequency. He experiences seizures causing "absence spells" and experiences them, on average, approximately three to four times a month. See Transcript at 38. They are brought on primarily by stress, although they have also been brought on by heat exhaustion. When he experiences a seizure, he loses consciousness for several minutes. When he regains consciousness, "there's some confusion." See Transcript at 41. When Oakes was asked about his ability to lift and carry weight, he testified that he can lift approximately twenty-five pounds, possibly even fifty pounds.

At step two of the sequential evaluation process, the ALJ found that Oakes' severe impairments include epilepsy. The ALJ found at step three that the impairment does not meet or equal Listing 11.02. He so found for the following reasons:

> … the record, consistent with the findings below, failed to indicate [Oakes] had convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment. With: (A.) Daytime episodes (loss of consciousness and convulsive seizures) or (B.) Nocturnal episodes manifesting residuals which interfere significantly with activity during the day. …

See Transcript at 21. The ALJ assessed Oakes' residual functional capacity and found that Oakes has work-related limitations caused by epilepsy. The ALJ accounted for the limitations and, in doing so, gave some weight to the reports prepared by Oakes' wife, brother, and sister-in-law. The ALJ so weighed the reports for the following reasons:

> … the opinions are based on casual observation rather than objective medical testing. In addition, the opinions are subject to motivations based upon loyalties of family, rather than disinterested evaluation. The opinions do not outweigh the accumulated medical evidence regarding the extent to which [Oakes'] limitations can reasonably be considered a result of his determinable impairments.

See Transcript at 25. As a part of making the assessment, the ALJ also found that Oakes can lift and carry fifty pounds occasionally and twenty-five pounds frequently. In so finding, the ALJ gave partial weight to Guinn's opinion that Oakes is limited to lifting and carrying a maximum of twenty pounds. The ALJ found at step four that Oakes is unable to perform his past relevant work but found at step five that there is other work he can perform.

Oakes maintains that his epilepsy meets or equals Listing 11.02, specifically 11.02B and 11.02D.[2] Oakes specifically maintains that he has met the frequency requirements of the listing and has provided a detailed description of the seizures from people who have observed the seizures. Oakes alternatively maintains the following:

---

[2]    Listing 11.02 encompasses epilepsy, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:

A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C).

OR

B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C).

OR

C. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

1. Physical functioning (see 11.00G3a); or

2. Understanding, remembering, or applying information (see 11.00G3b(i)); or

3. Interacting with others (see 11.00G3b(ii)); or

4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or

5. Adapting or managing oneself (see 11.00G3b(iv)).

OR

D. Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

1. Physical functioning (see 11.00G3a); or

2. Understanding, remembering, or applying information (see 11.00G3b(i)); or

3. Interacting with others (see 11.00G3b(ii)); or

4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or

5. Adapting or managing oneself (see 11.00G3b(iv)).

> The ALJ only addressed in his written decision whether Oakes meets Listing 11.00's requirements for convulsive epilepsy, that is, generalized tonic-clonic types of grand mal or psychomotor seizures. [The ALJ] apparently never considered whether Oakes meets the listing requirements for dyscognitive seizures. ... Here, the Court should remand for an award of benefits under listing 11.00B or 11.00D or, at the very least, should direct the Commissioner to properly consider Oakes' disability under those listings.

See Docket Entry 10 at 13-14.[3]

At step three, the ALJ is required to determine whether a claimant's impairments meet or equal a listed impairment. See Raney v. Barnhart, 396 F.3d 1007 (8th Cir. 2005). The determination is solely a medical determination, see Cockerham v. Sullivan, 895 F.2d 492 (8th Cir. 1990), and the claimant bears the burden of showing that his impairment meets or equals a listed impairment, see Pyland v. Apfel, 149 F.3d 873 (8th Cir. 1998).

Substantial evidence on the record as a whole supports the ALJ's finding at step three as the ALJ could and did find that Oakes' epilepsy does not meet or equal Listing 11.02. Although Oakes experiences seizures, one of the questions for the ALJ was the frequency with which the seizures occur. The ALJ could and did find that they did not, and do not, occur with the frequency required by the listing.

---

[3]    Listing 11.H1 defines epilepsy as a "pattern of recurrent and unprovoked seizures that are manifestations of abnormal electrical activity in the brain." The listing notes that in adults, "the most common potentially disabling seizure types are generalized tonic-clonic seizures and dyscognitive seizures ..."

Generalized tonic-clonic seizures are characterized by "loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions). Tongue biting and incontinence may occur during generalized tonic-clonic seizures, and injuries may result from falling." See Listing 11.00H1a.

Dyscognitive seizures are characterized by "alteration of consciousness without convulsions or loss of muscle control. During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swelling, or repetitive simple actions, such as gestures or verbal utterances) may occur. During its course, a dyscognitive seizure may progress into a generalized tonic-clonic seizure ..." See Listing 11.00H1b.

The record reflects that Oakes was treated for seizures prior to the alleged onset date of May 26, 2015. He was continued on Dilantin and appears to have benefitted from the medication as he reported few episodes. For instance, he saw Spanos on May 28, 2014, complaining of a convulsion that had occurred a month earlier. See Transcript at 280-281. Spanos characterized the convulsion as an "episode" and did not believe it to be related to a seizure disorder. Instead, he postulated that the "episode" was caused by heat prostration. Spanos continued Oakes on Dilantin and instructed him to follow-up on an annual basis.

Oakes mentioned the same "episode," or what Guinn characterized as a "spell," when Oakes saw Guinn five days later, but Oakes otherwise did not mention having had any other "episodes" or "spells." See Transcript at 310-313. Guinn diagnosed convulsions but made no changes to Oakes' medication.

Oakes did not report another "episode" or "spell" during the period prior to the alleged onset date.[4] In fact, Guinn observed in a December 1, 2014, progress note that Oakes had not experienced any new seizures in several years. See Transcript at 306. When Oakes saw Spanos for an annual check-up on May 7, 2015, Oakes made no mention of a seizure, "episode," or "spell." See Transcript at 282-283. The absence of any mention of a seizure, "episode," or "spell" by Oakes is consistent with the representations Spanos made in his Treating Physician's Report for Seizures Disorder. See Transcript at 332-333. In that document, Spanos represented that Oakes had not experienced a seizure in the year prior to July 9, 2015.

---

[4]    When Oakes saw Guinn on June 1, 2015, or after the alleged onset date, Oakes reported having had a "spell" at work, a "spell" that left him feeling absent and in a daze. See Transcript at 301. Although it is possible the "spell" occurred prior to the alleged onset date, the progress note reflects that Oakes did not believe the "spell" to be a seizure.

The record reflects that Oakes continued to be treated for seizures after the alleged onset date of May 26, 2015. He was continued on Dilantin and prescribed Depakote. He appears to have benefitted from the medications. For instance, although progress notes reflect that Oakes reported increased seizure activity, Guinn recommended in a February 8, 2016, progress note that Oakes wait six months to follow-up. See Transcript at 339. Moreover, Spanos observed in an August 10, 2016, progress note that Oakes had not experienced any significant increase in seizure activity. See Transcript at 351. Spanos observed that Oakes' use of Depakote diminished the feelings that oftentimes preceded the seizures. Despite Oakes' reports of increased seizure activity, Spanos recommended in the progress note that Oakes wait a year to follow-up. Were Oakes experiencing seizures with the frequency he alleges, one would expect to find a more vigorous treatment regimen for the seizures.

Guinn opined in an August 19, 2016, Statement that Oakes has a "seizure disorder (absent petit mal convulsions) that happen daily to weekly." See Transcript at 358. He represented that his opinions were supported by his "consultation with neurologist Dr. Spanos." See Transcript at 359. While Guinn may have indeed consulted with Spanos, it is difficult to see how Guinn could have arrived at his opinions given Spanos' unremarkable findings and observations with respect to Oakes' seizure activity.

The medical testing prior to, and after, the alleged onset date of May 26, 2015, was unremarkable. An EEG was performed on April 28, 2014, and the results were normal. See Transcript at 332. A second EEG was performed on July 27, 2016, and the results were again normal. See Transcript at 354. There is nothing about the medical testing to substantiate Oakes' assertion of frequent seizure activity.

Oakes' wife, brother, and sister-in-law completed documents on July 7, 2015, attesting, in part, to the frequency of Oakes' seizures. See Transcript at 200-207. For instance, Oakes' wife represented that she had seen about eight seizures in the year prior to July 7, 2015. The reports were completed, though, a mere two days before Spanos prepared his Treating Physician's Report for Seizures Disorder. See Transcript at 332-333. In that document, Spanos represented that Oakes had not experienced a seizure in the year prior to July 9, 2015. The ALJ is assigned the task of weighing evidence, and the ALJ weighed Spanos' opinions greater than the representations made by Oakes' wife, brother, and sister-in-law. The ALJ could do so.

Oakes undoubtedly experiences seizures, "episodes," or "spells." One of the questions for the ALJ was the frequency with which they occur. The ALJ could and did find that they did not, and do not, occur with the frequency required by the listing.

Oakes alternatively maintains that the ALJ only addressed whether Oakes meets the requirements for "convulsive epilepsy" or "generalized tonic-clonic types of grand mal or psychomotor seizures." Oaks maintains that the ALJ did not consider whether Oakes met or equaled the listing requirements for dyscognitive seizures.

There is no merit to Oakes' assertion for two reasons. First, the ALJ represented in his decision that he considered whether Oakes' epilepsy met or equaled Listing 11.02. See Transcript at 21. Although the ALJ did not specifically note whether Oakes' epilepsy met or equaled the listing requirements for dyscognitive seizures, the Court takes the ALJ at his word that he considered whether Oakes' epilepsy met or equal those listing requirements. See Hackett v. Barnhart, 395 F.3d 1168 (10th Cir. 2005) (court takes lower tribunal at its word when it declares it considered matter).

Second, notwithstanding the foregoing, substantial evidence on the record as a whole establishes that Oakes' epilepsy does not meet or equal the listing requirements for dyscognitive seizures. Specifically, there is little evidence that Oakes' seizures satisfy the frequency requirements of 11.02B ("occurring at least once a week for at least 3 consecutive months") or 11.02D ("occurring at least once every 2 weeks for at least 3 consecutive months").

Oakes offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Oakes maintains that his residual functional capacity was erroneously assessed because good reasons were not given for rejecting Guinn's opinion that Oakes can lift and carry no more than twenty pounds.

The ALJ must assess the claimant's residual functional capacity, which is a determination of the most he can do despite his limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). It is made using all of the relevant evidence in the record and must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of the assessment, the ALJ must consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). A treating physician's medical opinions are given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence. See Choate v. Barnhart, 457 F.3d 865 (8th Cir. 2006). The ALJ may discount a treating physician's medical opinions if other medical assessments are supported by better or more thorough medical evidence or where the treating physician renders inconsistent opinions that undermine the credibility of his opinions. See Id.

13

The ALJ addressed many of Guinn's opinions but did not specifically address Guinn's opinion as to Oakes' ability to lift and carry. <u>See</u> Transcript at 25. Ordinarily, such an omission would warrant a remand. In this instance, though, a remand is not warranted because substantial evidence on the record as a whole supports the ALJ's decision to reject that portion of Guinn's opinions. The Court so finds for three reasons.

First, Guinn's opinion as to Oakes' ability to lift and carry is inconsistent with Guinn's own progress notes. They reflect that Guinn examined Oakes on several occasions and repeatedly made unremarkable findings. Guinn either observed that Oakes had normal movement in his extremities and normal muscle tone and bulk, <u>see</u> Transcript at 312, 304, or otherwise made little mention of Oakes' physical infirmities, <u>see</u> Transcript at 306-309, 336-339.[5]

Second, Guinn's opinion as to Oakes' ability to lift and carry is inconsistent with Spanos' progress notes. They reflect that Spanos examined Oakes on several occasions, and Spanos repeatedly observed that Oakes had 5/5 strength bilaterally and normal muscle tone and bulk. <u>See</u> Transcript at 280, 282, 355, 351.

Third, and most telling, Guinn's opinion as to Oakes' ability to lift and carry is inconsistent with Oakes' own testimony. During the administrative hearing, Oakes was asked whether he had any "issues in terms of limitations in [his] ability to stand and walk or lift and carry, other than if [he] had … one of [his] staring spells." <u>See</u> Transcript at 42. He testified as follows: "I try, I can still lift 25, 50 pounds if I have to." <u>See</u> Transcript at 42.

---

[5]    It is true that Oakes complained of wrist pain when he saw Guinn on December 1, 2014. <u>See</u> Transcript at 306. Although Oakes complained of stiffness, Guinn observed no swelling, no redness, no warmth, and no crepitation. Guinn did not offer a diagnosis of the complaint and prescribed no medication.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Oakes' complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 11th day of July, 2018.

_____

UNITED STATES MAGISTRATE JUDGE